1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------
                              )
    Minnesota Chapter of      )   File No. 24-CV-536
4     Associated Builders and )        (KMM/ECW)
    Contractors, Inc., National )
5     Federation of Independent )
    Business, Inc., and Laketown )   Minneapolis, Minnesota
6     Electric Corporation,     )   September 16, 2024
                              )   1:57 p.m.
7              Plaintiffs,     )
                              )
8     vs.                     )
                              )
9     Timothy James Walz, in his )
    official capacity as Governor )
10     of the State of Minnesota, )
    Keith Ellison, in his official )
11     capacity as Attorney General )
    of State of Minnesota, Nicole )
12     Blissenbach, in her official )
    capacity as the Commissioner )
13     of the Minnesota Department of )
    Labor and Industry,       )
14                              )
              Defendants.      )
15     ------------------------------------------------------

16

17

18          BEFORE THE HONORABLE KATHERINE M. MENENDEZ
             UNITED STATES DISTRICT COURT JUDGE
19                    **(MOTION HEARING)**

20

21

22

23

24
          Proceedings reported by certified stenographer;
25     transcript produced with computer.


             PAULA K. RICHTER, RMR-CRR-CRC
                    (612) 664-5162

1    **APPEARANCES**:

2        For the Plaintiffs:        Littler Mendelson
                                     THOMAS R. REVNEW, ESQ.
3                                    KURT J. ERICKSON, ESQ.
                                     80 South Eighth Street
4                                    Suite 1300
                                     Minneapolis, Minnesota 55402
5
         For the Defendants:        Minnesota Attorney General's
6                                    Office
                                     NICHOLAS J. PLADSON, ESQ.
7                                    BENJAMIN HARRINGA, ESQ.
                                     445 Minnesota Street
8                                    Suite 1400
                                     St. Paul, Minnesota 55101
9
         Court Reporter:            PAULA K. RICHTER, RMR-CRR-CRC
10                                   300 South Fourth Street
                                     Minneapolis, Minnesota 55415
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3

4          THE COURT:  Welcome, everyone.  We are here for a

5    first hearing on a second motion related to dismissing in

6    this matter.  Let's get appearances on the record, first on

7    behalf of the plaintiffs.

8          MR. REVNEW:  On behalf of the plaintiffs, Tom

9    Revnew, appearing with my co-counsel, Kurt Erickson.

10          THE COURT:  All right.  Great.  Welcome to both of

11    you.  You've been around a long time.  I'm surprised you

12    didn't stand up.

13          MR. REVNEW:  I apologize, Your Honor.

14          THE COURT:  Don't worry about it.  My whole career

15    was in federal court, so the whole idea of ever sitting in

16    court, I didn't even know that was a thing until I started

17    working with some people who would come over from state

18    court.  I'm just giving you a little grief.

19          And are you going to be arguing, sir?

20          MR. REVNEW:  I am, Your Honor.

21          THE COURT:  Great.  Thank you.

22          And here on behalf of the defendants.

23          MR. PLADSON:  Nick Pladson and my colleague, Ben

24    Harringa.

25          THE COURT:  Okay.  Great.  And are you going to be

1    arguing, Mr. Pladson?

2           MR. PLADSON:  Yes.

3           THE COURT:  Thank you.

4           Let's go ahead and get started.  So my hope for

5    today's argument is that we can focus on any things that

6    have changed since the last time we had this conversation

7    and really kind of focus in on any new case law or new

8    authority that anyone would like to draw to my attention and

9    certainly the changed and evolved factual landscape.

10         I would like our conversation to include all of

11    the things that are now before me, so both the amended

12    complaint and the supplemented complaint.  And I didn't look

13    today.  There's nothing new?

14         MR. PLADSON:  (Shakes head.)

15         THE COURT:  Okay.  So I'd just like to have a

16    conversation about that.

17         It is my intention to very likely rule from the

18    bench today because I'd like to get this matter tied up.

19         So let's go ahead and get started, and I think

20    I'll begin with you, Mr. Pladson, if you don't mind coming

21    to the podium.

22         MR. PLADSON:  Good afternoon, Your Honor.

23         THE COURT:  Good afternoon.  How are you?

24         MR. PLADSON:  I'm all right.

25         THE COURT:  So we are in factual attack land

1    again, correct?

2              MR. PLADSON:  Correct.

3              THE COURT:  That means you don't get the normal

4    benefit of -- or that the plaintiffs don't get the normal

5    benefit of assuming that the facts in the pleading are

6    correct as to this question, right?

7              MR. PLADSON:  That's right.

8              THE COURT:  Tell me how you think I assess that,

9    what difference you think that makes to the calculus.

10             MR. PLADSON:  Well, I think the calculus, you have

11   to look at what facts have been submitted and properly

12   either authenticated or submitted and are admissible for

13   consideration at this juncture.  Right now we have

14   affidavits regarding two statements made by Governor Walz

15   that are in the record, and I don't dispute that those

16   are -- they are what they are.

17             THE COURT:  You're not raising an evidentiary

18   challenge to the fact that these things have been said.

19             MR. PLADSON:  No, not at all.

20             And the other thing, though, is that there aren't

21   any other statements of, you know, admissible facts in the

22   record.  Right now we've got an unverified complaint, which

23   is insufficient to oppose a dispositive motion.

24             THE COURT:  Is this in your brief?

25             MR. PLADSON:  Yep.

1          THE COURT:  Okay.  So what would it need to do to

2     be verified and sufficient to avoid a motion?

3          MR. PLADSON:  Well, I think in this context, they

4     would have to submit evidence that they have -- they, the

5     defendants -- or the plaintiff, excuse me, have been

6     threatened or that the defendants here are about to commence

7     proceedings to enforce the act against them specifically.

8          THE COURT:  Oh, I understand what you think the

9     showing has to be.  Are you arguing that I can't consider

10    anything -- so, for instance, I've got the allegations in

11    the complaint that include the amendment to the law and the

12    requirement of the website notifying people to hang posters.

13    You agree I can consider that?

14         MR. PLADSON:  You can consider that.  I think that

15    exists outside of the -- it's a matter of public record what

16    the law is and what the amendment is and what has transpired

17    there.  I think where the factual deficiencies are are with

18    what the plaintiffs have demonstrated as to themselves.

19         THE COURT:  And tell me what you think -- you mean

20    you think that this factual record that I have before me

21    isn't enough to show threatened enforcement.

22         MR. PLADSON:  Yes, that's exactly right.

23         THE COURT:  But you're not asking me to hold an

24    evidentiary hearing to require them to introduce, say, the

25    new website, the Walz tapes, any of that?

1          MR. PLADSON:  No.  We're fine with those being in

2     there.  They speak for themselves.

3          THE COURT:  Okay.  I'm just trying to make sure we

4     are all in agreement about what the record before the Court

5     is and we're talking about the significance or the weight to

6     afford to that record, right?

7          MR. PLADSON:  That's right.

8          THE COURT:  Very good.  So tell me why you think

9     the Walz speeches don't matter.

10         MR. PLADSON:  They don't contain a threat of any

11    kind.  They simply --

12         THE COURT:  What about, "You'll go to jail"?

13         MR. PLADSON:  It's inaccurate.  It's not true.

14         THE COURT:  I recognize that, but it's also far

15    harsher than the reality of remedy that's available.  I

16    mean, threat of enforcement, why doesn't that count?

17         MR. PLADSON:  Number one, it's not threatened

18    towards these plaintiffs, so that's part of our argument.

19         Number two, the governor has no connection with

20    the enforcement of the law.  He's charged with ensuring that

21    the laws are faithfully executed under the state

22    constitution.  He has no specific or even general authority

23    to enforce Section 181.531 or any of its parts.  And there's

24    no indication that any of the other things that might have

25    happened that could get, you know, his hands deeper involved

1    in this case, such as a directive to a cabinet member or a

2    directive to the attorney general, there's no evidence that

3    any of that has happened or that he's taken any of those

4    steps.  All we have are these two statements, these sort of

5    soapbox campaign speeches, essentially.

6         THE COURT:  What about him saying, I got sued for

7    this; there's nothing I'd rather get sued for?  That, you

8    know, really intimately kind of ties himself up with the law

9    and, frankly, recognizes that there's a lawsuit about this

10   law that he's kind of saying, bring it on, and yet you're

11   standing here saying, do not bring it on.

12        MR. PLADSON:  Well, I'm saying that he is not a

13   proper defendant in this case because he has no connection

14   to actually enforcing this law.  So let's say that we go

15   forward and the Court is about to enter an injunction of

16   declaratory relief.  What would the injunction do to

17   Governor Walz?  It would have to apply to him in some way

18   that stops him from doing something that he's allowed to do.

19   There's nothing that he's allowed to do under the state law

20   or that he's even shown an indication of that would connect

21   him with the enforcement, it would be purely illusory.

22        And so when we're looking at the remedies and who

23   the proper parties are here, I think you need to look at

24   what the action is that they otherwise could take that the

25   injunction would do to either prevent or limit or modify.

1          THE COURT:  So in *Whole Woman's Health*, one of the

2     things the Court grappled with at length is the extent to

3     which the various defendants or hypothesized defendants were

4     appropriate defendants.  And the Court landed on these

5     licensing agents who had, arguably, pretty tangential, if

6     any, tie to enforcement of the law, and the Court found that

7     that was enough to create a connection.

8          Help me understand why that doesn't strengthen the

9     claim that Governor Walz is, at least at this stage where he

10     retains the ability, for instance, to instruct his

11     commissioner to take action that's consistent with his

12     campaign speeches, discipline his commissioner for not

13     taking action that's consistent with his campaign speeches,

14     where is the daylight between Governor Walz and the

15     licensing agents in *Whole Woman's Health*?

16          MR. PLADSON:  I think in *Whole Woman's Health*,

17     we're on a 12(b)(6).  That's what they confronted there.

18     Here, we're on a 12(b)(1).  We're looking at the fact of the

19     matter and what the connection is.  And here there is no

20     steps that have been taken to create a connection.

21          You know, one of the arguments is that he could

22     hire his own attorneys if he had a disagreement with the

23     attorney general.  He hasn't done that.  There's no evidence

24     that that's imminent or forthcoming, much less that he could

25     enforce that specific portion of the law under that

1    particular provision should there be a conflict between

2    himself and the attorney general.

3         I also think that in that case in particular, when

4    *Whole Woman's Health* was remanded to the Fifth Circuit, they

5    then certified the question to the Louisiana Supreme Court

6    or maybe it's the Texas Supreme Court, whichever one --

7         THE COURT:  Texas.

8         MR. PLADSON:  Yeah.  And they determined that

9    there wasn't, in fact, a connection.  So looking at more of

10   a merits factual question that the licensing officials

11   weren't, in fact, the proper parties to be sued or to be

12   defendants for that.  So that's sort of how that case ended

13   up playing out.

14        THE COURT:  Thank you.  One of the things that I

15   think is interesting in the language about the *Ex parte*

16   *Young* doctrine is it always uses the word "threaten," and

17   I'm sort of struggling with what that means when it comes to

18   Governor Walz because he can be heard to sort of be

19   threatening enforcement of this law.  He's bragging about

20   it, and he is saying, if you run afoul of this law, you will

21   go to jail.  It feels threaty.  But in the language of *Ex*

22   *parte Young*, the threat tends to be read hand in hand with

23   enforcement, threatened to enforce.  So I'm trying to

24   decide -- there are places, though, that when you read the

25   standard articulated, it includes to "threaten or enforce,"

1    so threatening is enough.

2            And that was a big warmup to the observation that

3    in the First Amendment context, we always have concerns

4    about chilling, so that threats, even when more remote or

5    tethered to less robust ability to enforce, has the effect

6    of chilling.

7            And then we have the overlay of a private cause of

8    action statute, which is what caused Chief Justice Roberts,

9    I think such agita in *Whole Woman's Health*, is that you have

10   a statute that has an enforcement mechanism that drives

11   around some of the traditional actors in enforcing laws.

12           So tell me what you think I do with that and with

13   the idea of threats and chilling, aside from the specific

14   initiation of an enforcement action.

15           MR. PLADSON:  I think the concept of chilling is

16   appropriate in the Article III standing context, but it's a

17   concept that is not applicable to the *Ex parte Young*

18   standard.  And as we know from *Freeman* --

19           THE COURT:  Do you have any case law for that

20   idea?

21           MR. PLADSON:  Yes.

22           THE COURT:  I mean, I do see that it arises in

23   that context, but do you have any case law drawing that

24   line?

25           MR. PLADSON:  Well, *Freeman vs. RFL*, is Republican

1    Farmer Labor Party of Minnesota, this case has been up and

2    down to the Eighth Circuit a couple of times, and in both

3    the district court decisions from Judge Tostrud, they

4    discuss how the imminent standard is higher for an *Ex parte*

5    *Young.*  The Eighth Circuit recognized an imminence of threat

6    that is much higher.  You've got to meet a higher standing

7    than just plain Article III standing.

8            So it would be -- the most recent one would be

9    Judge Tostrud's district court decision from I think 2022,

10   after the first remand.

11           THE COURT:  2022 is the Eighth Circuit's decision.

12   So then he got another decision now?

13           MR. PLADSON:  '23, yeah.

14           THE COURT:  Okay.

15           MR. PLADSON:  And incidentally, it was appealed

16   again and affirmed in July by the Eighth Circuit.

17           THE COURT:  Okay.  Thanks.  That's a good answer.

18           You don't seem to dispute, particularly, that

19   Attorney General Ellison could be an appropriate defendant

20   if he had threatened action or was taking enforcement

21   action?

22           MR. PLADSON:  Yes.  I think it's clear the statute

23   gives him authority to do that if he chose to do so.

24           THE COURT:  And then Commissioner Blissenbach is

25   the sort of in between?

1          MR. PLADSON:  Right.

2          THE COURT:  You'd concede that there's all kinds

3     of duties that the statute has given her related to, if not

4     directly enforcing in terms of bringing a lawsuit, certainly

5     encouraging enforcement or doing things that have to do with

6     the enactment of the law.

7          Tell me why that isn't enough.  Why do we have to

8     hue, in this era -- no disrespect to legislatures intended,

9     but they are clearly learning to carve statutes to avoid

10    pre-enforcement lawsuits.  I think it's kind of hard to deny

11    that.  And in that era, why isn't it enough to strike as

12    actionable all of the trappings that go around a traditional

13    enforcement action but aren't that traditional, "I'm going

14    to bring a lawsuit" or "I'm going to enjoin you."  Instead,

15    it's advertising.  It's referring people to attorneys.  It's

16    inspecting properties with or without advance notice.  It's

17    running a website telling people what their rights are.

18    It's doing all of the things to facilitate and elevate those

19    private rights of action, but it's not being on the front of

20    the V.

21          So help me understand why you still think

22    Blissenbach isn't an appropriate defendant.

23          MR. PLADSON:  Right.  Well, if you look at the

24    *Balogh vs. Lombardi* case from the Eighth Circuit -- I think

25    it's 2013 or '15; it's in the briefs -- we have a situation

1     there where the bureau -- the director of the Bureau of

2     Prisons is appointing a panel, and he's engaged in selection

3     of individuals who will be on this panel regarding -- I

4     think it's carrying out the death penalty or certain

5     determinations, and there's a law that precludes individuals

6     from disclosing information about who those individuals are,

7     and those panelists have a right of action if somebody

8     discloses.

9            Now, they attempted to -- ACLU or somebody was

10    attempting to sue the governor -- or excuse me, the director

11    of the prisons for his connection to this because but for

12    him appointing people, there wouldn't be individuals there

13    to enforce this.

14           And here, I think what the Court says is that that

15    type of administrative or ministerial work in implementing

16    the statute is not the type of enforcement that is

17    envisioned by *Ex parte Young*, and it's taking action to

18    actually bring about or coercing change forcibly, you know,

19    an affirmative step to do so.

20           Now, here, the DLI commissioner -- this is not the

21    only law that the DLI commissioner has this authority over.

22    She has general authority over five or six different

23    chapters of Minnesota law, so effectively hundreds of laws.

24    She provides information about many laws, including those

25    she doesn't enforce.  That doesn't make her a proper

1    defendant for the federal laws that are listed on the

2    website.

3            She refers people to attorneys if they call her,

4    but it's primarily -- to be clear, it's not saying, go talk

5    to an attorney.  It's, I can't provide you legal advice; you

6    know, we are not taking claims here; we're not --

7            THE COURT:  Well, it's actually in the statute

8    that they will refer to attorneys, right?  It's not just,

9    oh, I can't answer this call, you've got to call a lawyer,

10   my standard answer when I make the mistake of answering my

11   phone.  It is actually more than that.  One of the things

12   she does is channel people to attorneys through whom they

13   can vindicate their right.

14           MR. PLADSON:  Sure.  It's actually not in the

15   statute.  Where you find that -- and this is where I was

16   getting clever was submitting exhibits -- but the

17   legislative history, when the law was passed in 2023 --

18   you'll see these attached in our first round of briefing --

19   the DLI commissioner was asked for input on how this law

20   would affect their operations.  The commissioner that -- the

21   agency responded that we don't believe we have enforcement

22   authority over this; if people call us, we will simply refer

23   them to attorneys.  Sort of not our -- not our bailiwick

24   here.

25           THE COURT:  Got it.

1    MR. PLADSON:  Get legal advice elsewhere.

2    So that is the extent of it, so I don't want that

3 to be overstated.

4    THE COURT:  Thank you.  So you don't think that

5 the website requiring posters is part of an enforcement

6 action here?  I mean, the case law from *Minnesota RFL vs.*

7 *Dayton*, *Care Committees I* and *II*, *Whole Woman's Health*,

8 other cases, the case law includes, you don't need to be the

9 primary enforcer; you don't need to be the exclusive

10 enforcer; there just must "be some connection," right?  I've

11 drawn those from multiple sources, but they don't require

12 the best, the only, the absolute, the sole.  And through

13 those together, you can imagine kind of a patchwork:  This

14 person is involved in this way, this person is involved in a

15 different way.

16    So why don't things like running a -- putting on a

17 website that you have to put up posters telling people that

18 they can't be required to attend these meetings and telling

19 people what their rights are if they are required to attend

20 these meetings, why isn't that part of a connection between

21 the defendant and enforcement of the law?

22    MR. PLADSON:  So with respect to the first prong

23 of the *Ex parte Young* standard, I think that certainly comes

24 closer, and I think that was important for us to notify the

25 Court back in May of the change.

1           I think when you look at that particular

2    provision, it simply requires the DLI commissioner to create

3    the notice -- notice of rights poster.  The DLI commissioner

4    creates many other notice of rights posters.  It doesn't

5    make them connected to the enforcement of the law simply

6    because when you look at that subdivision, Subdivision 3 of

7    the law, the new amendment when it becomes effective next

8    month, when you look at that subdivision, it simply requires

9    her to create a poster.  It doesn't say anything about her

10   requirement to enforce that law or go out and investigate.

11          Now, in her affidavit, she disclaims any intent to

12   investigate or enforce the notice posting requirement as

13   well, and so --

14          THE COURT:  What's the point of having this law if

15   its primary actor is refusing to enforce it?

16          MR. PLADSON:  Well, it's not the primary actor.

17   The primary mechanism for enforcement is the public through

18   the right of action.  There's not an administrative sort of

19   prerequisite investigation like you might have at EEOC or

20   something where you have to go to an administrative agency

21   for an investigation first.  You can go right to court.

22          And so what the officials here have chosen to do

23   is to see, you know, to what extent is this private right of

24   action going to be sufficient to carry out the purposes?

25   Why do we need to invest state resources enforcing this

1    particular law at this time?  That's within their discretion

2    as state officials to choose and prioritize different

3    things.

4         And I think in this case, particularly where

5    they've disclaimed any interest to do so, you know, any

6    particular official who's in that position is going to have

7    different priorities, is going to have different interests

8    and going to have different plans for what they're going to

9    do in office.  And I think the prudent decision that they

10   believe they've made is, let's see what kind of a problem

11   this is, and if the private right of action is insufficient

12   to address it, then we can maybe revisit whether we need to

13   take a more bold step or whether the AG, for example, needs

14   to take more aggressive action.

15        THE COURT:  Let me ask a theoretical, academic

16   type of question here, as you know I want to do.  One of the

17   things I have been thinking a lot about in this new

18   legislative model with private right of action is that if we

19   get to the merits of the constitutionality of this law now

20   in this lawsuit, we will have excellent lawyers on both

21   sides, we will have somebody whose job is to defend the

22   constitutionality of a statute and understands it very well.

23        If we continue to say, oh, no, it's a private

24   right of action, there can never be *Ex parte Young*

25   satisfying pre-enforcement lawsuit.  We have to wait until

1     an employer takes action, terminates or disciplines an

2     employee, gets sued, and then see how well that lawyer

3     versus that employer can litigate this important

4     constitutional issue.

5          One of the things that I feel like was going on

6     with the Court in *Whole Woman's Health* is kind of a concern

7     that if you -- you're avoiding -- you are essentially

8     evading constitutional review or you risk evading

9     constitutional review.  So then it requires -- that employer

10    might be a small unsophisticated employer -- to understand

11    that they can bring a First Amendment challenge in an

12    employment case.

13         Isn't this better?

14         MR. PLADSON:  No, because we don't have -- what is

15    functional -- what *Ex parte Young* requires is sort of the

16    functional equivalent of ripeness.  And here, because we

17    have no threatened action, we have just the hypothetical of

18    how this law might apply.  And the Court in *Whole Woman's*

19    *Health* reiterates that there's no unequivocal right to a

20    pre-enforcement challenge.

21         And just because, you know, the traditional route

22    is to raise it as an affirmative defense -- and I will say

23    that in Minnesota, if it is raised as an affirmative defense

24    and somebody challenges it, they've got to notify the

25    attorney general so the attorney general can choose to

1   defend the law.  And in that context, you have an actual

2   fact pattern to work with.  We're not talking in the

3   theoretical or the metaphysical about whether this -- you

4   know, how does this play out and how does the First

5   Amendment intersect with this.

6       And so all we're simply saying is that at this

7   point under *Ex parte Young*, this is not ripe for federal

8   court adjudication.  It doesn't mean there couldn't be a

9   cause of action in state court.  It's possible.  I don't

10  specifically know, and I'm not going to go over my skis here

11  in trying to describe how it might come up.  But I think

12  here, where you've got nobody who has expressed a threat or

13  an intent to -- who has a connection to the law, that has

14  not expressed an intent or threat to commence proceedings to

15  enforce it, you don't have a ripe action under *Ex parte*

16  *Young*.  And that's not the language they use.  That's

17  conflating it with ripeness and --

18      THE COURT:  Yeah, yeah, but it's an interesting

19  analogy.

20      MR. PLADSON:  You've got to have an imminent

21  threat, and the Eighth Circuit says that imminent threat has

22  to be something more than ripeness under Article III.  So

23  that's where we land.

24      THE COURT:  Okay.  What else do you want me to

25  know?

1          MR. PLADSON:  I would like you to grant our motion

2     to dismiss entirely.

3          THE COURT:  I didn't mean to be flip.  Is there

4     anything else you want to share that you think I am

5     misperceiving or that has changed since our last

6     conversation?

7          MR. PLADSON:  No, I don't think there's been

8     anything -- well, the last conversation was before the

9     statute was amended.  We think that still doesn't change the

10    ultimate outcome.  This case fails on prong two of *Ex parte*

11    *Young* under any analysis, whether you buy my argument about

12    Commissioner Blissenbach or not, that there's no imminent

13    threat of enforcement here.

14         THE COURT:  Can I ask you one last question about

15    the Governor Walz thing?  You raise an interesting point

16    about thinking of the connection to the statute through the

17    lens of declaratory relief or an injunction or something

18    like that, and I'll be the first to admit that I'm just

19    starting to understand how difficult it is to actually grant

20    injunctive relief, to figure out what that looks like, what

21    it means.

22         But what difference does it make, as a practical

23    matter, if -- let's hypothesize that I allow this case to go

24    forward and that Commissioner Blissenbach and Attorney

25    General Ellison are easy to -- more obvious to remain in the

1   case but that Governor Walz is more difficult and I am on

2   the fence.

3           If I allow him to remain in the case and it turns

4   out he's unaffected if the plaintiffs are successful and if

5   there is injunctive relief, then the injunction just doesn't

6   tie his hands in the end.  If I determine that there is

7   action he could take, that his hands should be tied if the

8   plaintiffs are successful and if there's injunctive relief,

9   then I include it.

10          Why does it matter?  And I'm not talking Law

11  Review article.  Why does it matter practically in this

12  case?

13          MR. PLADSON:  If I understand the question

14  correctly, and correct me if I'm wrong, but if he does not

15  have the ability to -- he doesn't have the ability to carry

16  out what is specifically permitted to be enjoined under

17  *Ex parte Young* and sovereign immunity, which is the direct

18  enforcement.  I take the point earlier about, you know, role

19  in the process and you could have, say, two entities or two

20  officials who have some, you know, complementary roles in

21  the enforcement mechanism, but he has no role at all.  You

22  would not be able to bind him in any sort of action

23  whatsoever.  The declaration would be either -- the

24  injunction would be illusory.

25          And I think there's a helpful analog to --

1          THE COURT:  But what difference does it make now?

2   I mean, that's what I'm trying to sort out.  So let's say

3   you lose and I leave him in, and at the end, you're right.

4   Let's say also the plaintiffs win on the merits, which I am

5   not at all presupposing.  And then it comes time to draft

6   that injunction and I'm like, oh, yeah, there's really

7   nothing to tie Governor Walz's hands with.  And I'm not

8   being cavalier about this.  But he's got the same set of

9   lawyers.  It's no extra skin off our governor's nose whether

10  he is one of these three defendants or not.  Why does this

11  matter in the universe?

12          MR. PLADSON:  Well, because under the Eleventh

13  Amendment jurisprudence, state officials have a

14  constitutional right to not be drug into federal court, and

15  federal court is court of limited jurisdiction, and this --

16  subject matter jurisdiction, Eleventh Amendment questions

17  are supposed to be decided early on to prevent state

18  officials from being -- sort of the flowery language is

19  ensnared in ongoing litigation and that sort of thing, these

20  concepts that have been reiterated throughout the last

21  century.

22          But that's why.  If he has not got a sufficient

23  connection, and we don't think he does, then he deserves his

24  right to be out of the suit -- the Office of the Governor

25  deserves to be out of the suit.

1          THE COURT:  Is there nothing that he could say in

2   a speech that would put him in this suit?

3          MR. PLADSON:  I think it's -- well --

4          THE COURT:  I mean, "You're going to jail" isn't

5   enough?

6          MR. PLADSON:  No, because, number one, it's not

7   true, and number two, it doesn't -- it wasn't directed at

8   any particular individual.  It wasn't directed at the

9   plaintiffs.  The plaintiffs haven't indicated that they're

10  further -- or provide any admissible evidence that they've

11  felt threatened or chilled in any manner, and he doesn't

12  have a connection to the enforcement.  If he said, tomorrow

13  morning I'm going to go out and I'm going to direct

14  Commissioner Blissenbach to start investigating and I'm

15  going to ask Governor Walz to -- Attorney General Ellison --

16  I've got too many clients here -- Attorney General Ellison

17  to reconsider his statement that he has no intent to enforce

18  it and we're going to push it, I think that's a much closer

19  question.  I think it's much harder for us to say that that

20  involvement is not enough.

21          I still think there's a question with whether

22  functionally he could, absent somebody else -- like without

23  Commissioner Blissenbach, he can't investigate the law.  He

24  can appoint the DLI commissioner, just like the director in

25  *Lombardi*.

1          THE COURT:  And he can fire Commissioner

2    Blissenbach if he continues to emphasize this in his own --

3    forget politics -- in his own set of policy priorities.  If

4    he continues to emphasize this and she continues to say, I'm

5    not going to inspect anyone, he could fire her.

6          MR. PLADSON:  Right.

7          THE COURT:  Okay.

8          MR. PLADSON:  And that's not the facts that are

9    here, though.  We don't have any facts that he's threatened

10   or that he's directed --

11         THE COURT:  Right, but he can.

12         MR. PLADSON:  Yep.

13         THE COURT:  He can.  He could remove her.  She is

14   appointed at his discretion.

15         MR. PLADSON:  And I think, going back to *Lombardi*,

16   she's the one that still has the -- to the extent that there

17   is -- and I know we disagreed about whether she's close

18   enough, but assuming she is, she is the one that has that

19   right to do the investigation.  He still doesn't.  He gets

20   to a point, but he still isn't the person.

21         THE COURT:  And he gets to terminate.

22         MR. PLADSON:  And he gets to terminate, yeah.  But

23   then he's got to appoint somebody else and got to make sure

24   that they're going to go forward, and they must actually

25   threaten or be about to commence proceedings under prong

1        two.

2                THE COURT:  Okay.  Thank you very much.

3                MR. PLADSON:  Thank you.

4                All right.  Mr. Revnew.  Give me one second.  Let

5        me get my ducks in a row here.

6                Go ahead.  Same lens.  I still know all the stuff

7        I learned last time, and I guess our focus should be more on

8        what's changed or what's grown or what's evolved.

9                MR. REVNEW:  Yeah.  Good afternoon, Your Honor.

10               The Court is well aware of the new facts.  And

11       when we first filed our complaint, we did not have the

12       existing statement by Governor Walz that you go to jail if

13       you violate this law.

14               THE COURT:  Does it matter that that's hogwash?

15       No disrespect to anyone with the term "hogwash," but nobody

16       is going to jail, no matter who violates this law.

17               MR. REVNEW:  I think it does matter, Your Honor.

18       We are talking about a First Amendment issue here, and it is

19       an issue with regard to -- if you point discrimination and

20       we have the chief executive of the State of Minnesota saying

21       that if you engage in this conduct, you will go to jail, the

22       average person in the general public has no idea whether

23       they're going to go to jail or not.  That in and of itself

24       is, in fact, a threat.  So I think it does matter that he

25       made that comment.

1            And I understand defendants' counsel is claiming,

2     well, it's a misstatement of what the law provides, but it

3     is still a threat.  And it shows an intent to enforce the

4     law, which is what we're looking at, and an intent to

5     enforce the law.

6            THE COURT:  What about the admonitions including

7     from *Whole Woman's Health* but also I think from Minnesota,

8     *RFL vs.* -- I guess it's *Freeman*, that it's not enough just

9     to have a theory of chilling, that *Ex parte Young* isn't just

10    about a theory of chilling and that it has to be more in --

11    as to any constitutional right.  And I think it's *Whole*

12    *Woman's Health* that lists the First Amendment but also other

13    constitutional amendments and says that as to any of them,

14    it's not enough to just say, I'm nervous about exercising my

15    right because this might happen.  That isn't enough.  There

16    has to be more.

17           MR. REVNEW:  Well, I think there is more here.

18    And I go back to the sitting governor's statement that "You

19    will be arrested."

20           And it goes beyond that, Your Honor, because in

21    this instance, the governor knew that this case was ongoing.

22    The governor knew that the complaint -- this Court allowed

23    us to amend the complaint to name Governor Walz as a

24    defendant to this case.

25           And in addition, Your Honor, the governor would

1    know as to the nature of this case that he was served, that

2    there was a threat, that the plaintiffs perceived that he

3    was threatening enforcement of this case.

4         Despite that, the governor does not sign a

5    declaration saying, I have no intent and will never enforce

6    this statute.  He didn't say that.  In fact, he said the

7    opposite, where roughly a month ago, August 14th, he stood

8    up in front of a group and he doubled down.  And it wasn't

9    that I'm going to disclaim that folks would be arrested.  He

10   doubled down and said, the last time I talked about captive

11   audience speeches, I was sued and it was the best thing that

12   ever happened to me and we're going to continue to ban those

13   captive audience speeches.

14        THE COURT:  Does it matter that he has actually no

15   authority to do any of that?  That he doesn't have the

16   authority to send someone to jail?  That he doesn't have the

17   authority to ban it?  That's something the legislature did.

18   And that he's not the actor who has any enforcement

19   authority?

20        MR. REVNEW:  Well, I think that the question

21   assumes something that I disagree with, and that is I do

22   think Governor Walz does have an enforcement mechanism here.

23   And we can piece it all together, Your Honor, with regard

24   to, first, we can start with the Minnesota Constitution that

25   he has the authority that he needs to ensure that the laws

1    are faithfully executed.  And I'll concede that that in and

2    of itself is not going to be enough, Your Honor.

3            But two, under the Minnesota statutes, he has the

4    right to employ counsel to act in any action or proceeding

5    if the attorney general is in any way adverse to the State.

6            So you have this dilemma where you have the

7    attorney general saying, I'm not going to enforce, which is

8    directly adverse to what Walz is saying, that he wants to

9    enforce it.  And so I think you have to tie in Minnesota

10   Statute Section 806, tie that together with his

11   constitutional duties, but also tie in --

12           THE COURT:  We have to be careful though, right,

13   sir, because -- putting aside the speeches for just a

14   moment, your sewing together different important statutory

15   and constitutional provisions would apply to any statute and

16   would mean that any statute that had a risk of First

17   Amendment chilling would be amenable to a pre-enforcement

18   lawsuit, regardless of expressed intent to enforce or

19   bringing enforcement actions, based instead on the strength

20   of the ability to enforce.  And I think the law is pretty

21   clear that something more is required.  Otherwise, Chief

22   Justice Roberts wouldn't have reminded us that chilling

23   alone isn't enough.

24           So isn't there some risk when you are pointing to

25   things in the statute that require enforcement that it ends

1      up kind of vitiating the imminent threat part of *Ex parte*

2      *Young*?

3              MR. REVNEW:  So, Your Honor, I think there's one

4      important factor here.  In all of the cases that have been

5      presented to the Court in the briefing, there is not one

6      case where a governor has made the statements that Governor

7      Walz has made.  Not one case.  Pretty egregious statements

8      that he's going to shut down free speech, because what does

9      the law provide?  The law provides that you can't talk about

10     political speech or religious speech, and political speech

11     is very broadly defined.

12              And I hear what you're saying, Your Honor, but in

13     the cases that are cited -- I believe the defense counsel

14     cited the Eighth Circuit case in *Church.*  And as you dig

15     into that particular case in *Church*, it goes on and it cites

16     another Eighth Circuit case, *Citizens for Equal Protection*

17     *vs. Bruning*, 455 F.3d. 859.  And the Eighth Circuit in that

18     case specifically said that general enforcement authority

19     means that you have some connection if that authority gives

20     the governor methods of enforcement.  And what I submit to

21     the Court here is that the statutory framework, the

22     constitutional framework, gives Governor Walz the method of

23     enforcement.

24              THE COURT:  But that's not enough by itself,

25     right?  You would agree that just because he has the method,

1    if he's not acting on it, using it, or threatening it, the

2    fact that he has the authority isn't enough.  The fact that

3    Attorney General Ellison has the authority, the fact that

4    Commissioner Blissenbach has the authority, on paper that is

5    not enough.  Something more has to be present.

6            MR. REVNEW:  So, Your Honor, I agree with you

7    that -- I mean, when we're talking about *Ex parte Young*,

8    it's a two-part analysis, right?  Do you have the ability to

9    enforce?  And are you, in fact, threatening to enforce the

10   law?

11           And I submit to the Court, as our briefs have laid

12   out and our complaint has laid out, that all three

13   defendants, Commissioner Blissenbach, Attorney General

14   Ellison, and Governor Walz, they all have the ability to

15   enforce, and there is a threat here.

16           And what I'd like to point out to the Court --

17   because you asked me -- at the last oral argument, you had

18   asked a question of me with regard to the declarations that

19   were submitted.  And within the declarations, the defendants

20   state they have no present intent to enforce.  And I believe

21   as part of our discussion during the last oral argument, I

22   believe the Court noted that, well, if we looked at *Care*

23   *Committee*, in that case, the declarations actually had a

24   little bit more, which said, "I will not enforce."

25           THE COURT:  Right.

1          MR. REVNEW:  And what I wanted to point out to the

2     Court is that if we look at the *Freeman* case, and the

3     *Freeman* case that was decided by the district court, so

4     486 F.Supp.3d. 1300.

5          THE COURT:  What's the date on that?

6          MR. REVNEW:  2020.

7          THE COURT:  Okay.  So this is before it went up to

8     the Eighth?

9          MR. REVNEW:  It's before it went up to the Eighth.

10    But what I wanted to point out to the Court is in that case,

11    the district court did look at the case that I mentioned

12    during the last oral argument, the *UFCW vs. International*

13    *Beef Processors*, 857 F.2d. 422, to say, I can, as a district

14    court, ignore these declarations that don't contain the

15    language.  I have no intention -- or I will not enforce the

16    statute ever.

17         THE COURT:  But didn't the Eighth Circuit squarely

18    disagree -- I mean, if not squarely disagree, the Eighth

19    Circuit in the *Minnesota RFL vs. Freeman* case specifically

20    said that a disavowal of future prosecution is not required.

21    No present intention is enough.

22         MR. REVNEW:  But, Your Honor, I think that's the

23    point I'm trying to make --

24         THE COURT:  Okay.

25         MR. REVNEW:  -- which is there's a factual

1    distinction here, right?  And *Republican Farmer Labor*

2    *vs. Freeman*, you didn't have a governor who not once but

3    twice made statements that were threatening in nature, and

4    we do in this case.

5         And what I'm trying to point out to the Court is

6    the district court acknowledged that it can ignore

7    declarations based upon the factual layout of what has

8    happened in a particular case.

9         And in this case, what I want to point out to the

10   Court is not only did Governor Walz not submit a declaration

11   saying he has no present intent to enforce and will never

12   enforce, but the two other defendants doubled down and

13   submitted the same declaration, "I have no present intention

14   to enforce."  It's wishy-washy.  It's squishy.

15        And remember, the general public, when we're

16   talking about a free speech right, when a sitting governor

17   says you're going to go to jail, and you have the

18   commissioner and the attorney general saying, well, I have

19   no present intent to enforce, that really sends a bad

20   message.  In fact, I believe that the Court can ignore the

21   declarations that have been submitted by the two other

22   defendants, Attorney General Ellison as well as Commissioner

23   Blissenbach.

24        THE COURT:  Okay.  What else?  Anything else you

25   want me to keep in mind?  Answer one of -- that same

1    question that I subjected opposing counsel, Mr. Pladson, to.

2    What difference does it make, as a practical matter -- let's

3    hypothesize that I was going to deny the motion to dismiss

4    as to Commissioner Blissenbach and Attorney General Ellison.

5    What difference does it make if Governor Walz is in the

6    case?

7              MR. REVNEW:  Hypothetically speaking -- I mean,

8    first, I believe that the governor should be in, so I'm

9    taking your hypothetical question that the Court were to

10   say, you know, it's too tenuous as far as a connection or

11   there's no threat whatsoever.  Regardless, Your Honor, we

12   end up getting to the merits of the case, right, with regard

13   to Nicole Blissenbach as well as to Attorney General Ellison

14   and the constitutionality of the statute.  So from a

15   practical standpoint, I don't think it makes a difference.

16             THE COURT:  Okay.  Thank you.  Anything else?

17             MR. REVNEW:  No.  Thank you, Your Honor.

18             THE COURT:  Okay.  Mr. Pladson, you want the last

19   word?

20             MR. PLADSON:  Sure.  Just quickly, the fact that

21   Governor Walz didn't submit a declaration I don't think

22   matters.  It's the plaintiffs' burden to prove subject

23   matter jurisdiction here, and they have not submitted

24   sufficient evidence.

25             Lastly, with respect to the RFL district court

1    case from 2020, that was a 12(b)(6) motion, and Judge

2    Tostrud specifically ends his analysis on the first prong of

3    *Ex parte Young*.  So he is -- it doesn't matter for that

4    stage, and we acknowledge that.  That's why we brought the

5    motion the way we did.

6         And then I would just caution any reliance on

7    *Citizens vs. Bruning*, the Eighth Circuit case.  I think if

8    you follow the subsequent Eighth Circuit decisions, they

9    identify a very unique situation there with the Nebraska

10   Constitution, the gay marriage amendment and enforcement

11   structure and they've cabined that sufficiently.  So that's

12   all I have.

13        THE COURT:  Thank you.  I am going to rule from

14   the bench.  And I am going to deny the motion to dismiss as

15   to all three of the defendants.  I am going to explain my

16   ruling in detail.

17        I'm also denying the plaintiffs' request that I

18   sua sponte grant summary judgment in their favor.  That is

19   premature.  I have no briefing before me on which I could

20   hang my hat, and we'll talk about next steps at the end of

21   my explanation of my ruling.

22        I am doing this from the bench specifically

23   because I don't want to continue to delay.  In

24   tongue-in-cheek candor, I worry that the factual landscape

25   will continue to evolve and speeches will continue to be

1    made, and we don't need to continually talk about whether

2    one or the other of these things has tipped us over into the

3    appropriate land where the case can move forward.

4        So I appreciate the excellent briefing, and

5    everybody is on the same page, more or less, about what the

6    standard is.

7        Eleventh Amendment immunity is really important.

8    I don't make light of it.  It's part of why I have spent a

9    lot of energy really thinking about these issues.  And I

10   really resist any hint that chilling alone is enough, and I

11   resist any hint that if it involves the First Amendment, it

12   doesn't matter if there's a threat to enforce.  Nothing I'm

13   saying should be taken to suggest that I'm weakening or

14   intending to weaken these requirements.

15       But there is this expert -- I'm sorry, there is

16   this exception under *Ex parte Young*, and I have to ask two

17   questions:  Is the relief sought prospective?  And if there

18   are officials with the ability to enforce that statute that

19   either have threatened or are about to commence proceedings,

20   then the exception to the sovereign immunity kicks in.

21       I've read the cases carefully, frankly, over and

22   over again.  I want to make a couple of preliminary

23   observations.

24       This is a strange procedural posture in the case

25   law because it is a factual attack.  It is a motion to

1    dismiss, but it isn't a 12(b)(6), and that does make a

2    difference in these decisions.  That is what explains the

3    difference between *281 Care Committee I* and *281 Care*

4    *Committee II.*  And I think it's part of what informed the

5    Court in *Whole Woman's Health*, although I think we could

6    have a three-day seminar on what the holdings of *Whole*

7    *Woman's Health* actually are and how to apply them moving

8    forward.

9         So I recognize this is a factual attack, and the

10   claims in the complaint aren't entitled to deference and I

11   have to look at evidence.  But I also recognize that, you

12   know, there are likely to be additional developments of

13   facts about who does what with respect to the statute as the

14   case moves forward.

15        So although I am not suggesting this is a

16   preliminary facial ruling, I am observing that if the

17   landscape should change, if new things come up about the

18   applicability of the *Ex parte Young* exception, those can be

19   re-raised.  This door is not slammed.  The Court has the

20   obligation to keep its jurisdiction in mind at every stage.

21        So the first question I have to answer is whether

22   there is a connection between the defendant and the

23   enforcement of the law.  And the case law teaches that it

24   need not be an exclusive enforcement responsibility.  It

25   need not be the only official with a connection to the

1    enforcement of the law.  It may not be the primary

2    enforcement ability.  In fact, if anything, *Whole Woman's*

3    *Health* really brings that home.  But there must be some

4    connection.

5         And so based on my review of the same cases I'm

6    going to repeat over and over, *Minnesota RFL*, *Care Committee*

7    *I*, *Care Committee II*, and *Whole Woman's Health*, I am going

8    to determine that all three of these defendants have an

9    adequate connection to enforcement or threatening

10   enforcement of the law.

11        Let's start with Governor Walz.  Governor Walz can

12   appoint and can remove Commissioner Blissenbach.  That is a

13   distinction from the *Balogh* case and I think from the *Church*

14   case as well.  I apologize if I'm mixing up my citations.

15   It is something that makes this different from simply having

16   appointing ability.

17        Governor Walz continues to make speeches

18   celebrating the passage of the law but going a step further.

19   It isn't just enough to say, this is an accomplishment

20   during my administration of which I am very proud, we passed

21   this law.  It is going a step further and saying, and if you

22   violate this law, you will go to jail.

23        It does seem that there is a disconnect between

24   the actual sanctions for alleged violations of the law and

25   what he made his speech about, but it nonetheless evinces a

1    commitment to enforcing the law and a threat of enforcing

2    the law that is unique among all the cases that I could

3    find.  I've never seen a case where a defendant advocating

4    for dismissal is simultaneously having the chief executive

5    of the state threatening enforcement of the law.  Making

6    your jobs a little difficult, I realize, but it matters in

7    this context.

8            I disagree that this is meaningless politics.  I

9    think it would be closer -- and I'm not saying you meant it

10   was meaningless politics, but I disagree that there's an

11   exception here for things that are said from the campaign

12   trail.  This particular combination of speeches is more than

13   just celebrating the passage of the law or the good idea

14   behind the law.  It is threatening enforcement, and it is

15   proudly mentioning that I'm going to keep talking about this

16   even though I am getting sued for it.  It elevates the

17   robustness of the commitment.

18           I think it's interesting that this case law

19   doesn't always just talk about imminent enforcement, as in

20   we've gotten a call, they've executed a search warrant,

21   they've brought a complaint.  It also talks about threats,

22   and this is as close to a threat in the case law as I have

23   seen.

24           So even though I think Governor Walz has a less

25   robust tie to the enforcement of the law, he has the most

1    robust tie to threatening to enforce the law, and he has a

2    sufficient tie to enforcement of the law to make him an

3    appropriate defendant.

4          This is the closest call of the three defendants,

5    and I'm mindful of the wise council of defense counsel that

6    if you can't think of how you would bind the defendant with

7    injunctive relief, that could be an observation that he

8    should not be an appropriate defendant.  But here, there is

9    enough of a showing of his connection to the enforcement and

10    the threatening of the enforcement of the law, and he has

11    demonstrated a unique interest in enforcing this law, such

12    that things that might otherwise be dormant on the books,

13    like the ability to fire the commissioner or the ability to

14    take other action in enforcement of the law, are elevated in

15    this case in a way they might not be.

16          I want to be very clear.  I think that some of the

17    argument from the plaintiffs here go too far and would make

18    the governor or certain agents subject to the *Ex parte Young*

19    exception simply because you can articulate an ability to

20    enforce the law without actually any threatened enforcement.

21    And I'm not suggesting that Governor Walz or any governor is

22    always the appropriate defendant in a case like this.  But

23    here, those speeches, combined with the ability to remove a

24    commissioner who might not feel as zealous about this law as

25    he does, is enough to move forward.

1          With respect to Commissioner Blissenbach, I also

2     find that the commissioner has an adequate tie to

3     enforcement of the law.  I think that this case law is going

4     to continue to evolve as we have more cases that are

5     designed for enforcement through a private right of action.

6     That makes the role of the state executives different from

7     simply being the person who brings the lawsuit, brings the

8     criminal complaint, brings the enforcement action.  But

9     here, the statute is replete with examples of things that

10    the commissioner does in support of the enforcement of this

11    law, and there's no suggestion that it has to be simply a

12    pure traditional prosecutorial authority to count as

13    sufficient tie to the enforcement of the law.  I'd point to

14    *Doe vs. DeWine* and *Jones vs. Jegley*, J-E-G-L-E-Y, as well as

15    *Whole Woman's Health*, in support of this observation.

16          I'd also note that the statute itself uses the

17    term "enforcement," enforcement of this chapter by the

18    department, and so that means something in the statutory

19    scheme about her connection to the law.

20          The referrals to the attorneys, I think I had a

21    slight misapprehension about how that worked, but certainly

22    the website that's telling people to put up posters that

23    advertise to the employees what the nature of their rights

24    are under the law is an additional fact.

25          And then with respect to Attorney General Ellison,

1    I don't think there's any real dispute that he actually has

2    enforcement ability, so as to prong one, that one is easier.

3         The second question then is, is there any threat

4    of enforcement?  There has to be more than just the ability

5    to enforce.  There has to be something else.

6         I'm going to note that I don't agree with either

7    side's characterizations entirely of how to apply *Whole*

8    *Woman's Health*.  I feel like the defendants sort of want me

9    to kind of disregard what it suggests for pre-enforcement

10   litigation, and the plaintiffs want, even though they

11   disavow this in their briefing very credibly, are really

12   advocating for an application that heavily reduces the

13   requirement that they're being threatened or imminent

14   enforcement.  But I think somewhere in the middle, *Whole*

15   *Woman's Health* represents a shift in the application of *Ex*

16   *parte Young*, or certainly could do so.

17        I note that the *Minnesota RFL* case involves a

18   different statutory scheme and barely grapples with *Whole*

19   *Woman's Health* and its impact on the questions there.  It

20   mentions it twice, once in a footnote and once in the body

21   of the opinion, but it doesn't do the wrestling with the

22   case that I think we've done here, and perhaps that's

23   because it was so much more recent at the time.

24        The Chief Justice in *Whole Woman's Health* says

25   that eight justices agree that *Ex parte Young* applies there

1    because there exists state executive officials who retain

2    authority to enforce the law.

3        We have much more than that here.  We have state

4    executive officials who retain the authority to enforce the

5    law in some way, and we have steps taken affirmatively

6    toward executing that authority, including Commissioner

7    Blissenbach's being instructed to put up the website and

8    advertise for the posters, but also including the chief

9    executives repeatedly talking about this law and threatening

10   explicitly to enforce it.

11       I disagree that enforcement has as narrow a

12   meaning as the defendants suggest, given the private right

13   of action nature of this scheme, and Commissioner

14   Blissenbach is already taking steps to do their part to

15   enforce the scheme.

16       I also note that threatening and talking about

17   enforcement goes an extra step, which is encouraging

18   individual citizens in this private right of action to take

19   their steps toward enforcing the scheme.  That's where *Whole*

20   *Woman's Health* and this case have more in common than either

21   the *RFL* case or the *Care Committee 281* case.  Although one

22   of those does have the capacity for private right of action,

23   it also has direct state enforcement possibility.  This case

24   is different.  This statute is designed differently.  I

25   don't know yet if I'm convinced that this statute was

1    designed in this way specifically to avoid pre-enforcement

2    litigation or because, as you say, thinking of a more useful

3    allocation of resources, but I don't know that it matters at

4    this stage.

5         I'll note that Attorney General Ellison has taken

6    the least action but has the strongest connection with the

7    enforcement of this statute.  And, therefore, with the

8    imminent threats related to enforcement, I find that there

9    is enough for this litigation to proceed.

10         The third observation I want to make is that this

11    is a First Amendment case.  And in *Jones vs. Jegley*, which

12    was an Eighth Circuit 2020 case, it rejected the argument

13    that a plaintiff must first get prosecuted before

14    challenging a First Amendment statute.  And here, getting

15    prosecuted is getting sued, given the statutory design, and

16    the concern there was chilling speech.  I don't agree that

17    anytime a law has the effect of chilling speech, the

18    Eleventh Amendment immunity issues go out the window.  That

19    can't be.  Otherwise, we could never see the application of

20    this in the context of the First Amendment, and we see this

21    analysis over and over again in First Amendment cases.  But

22    here, there is something unique about public threats to

23    enforce this law that has an extra concern for chilling.

24         I'm going to quote *NRA vs. Vullo*.  "Ultimately,

25    *Bantam Books* stands for the principle that a government

1    official cannot do indirectly what she is barred from doing

2    directly.  A government official cannot coerce a private

3    party to punish or suppress disfavored speech on her

4    behalf."  It's not a perfect analogy for a lot of reasons,

5    but it is instructive to me about the way the fact that we

6    risk chilled speech here plays into the *Ex parte Young*

7    analysis.

8              So I think I've explained my reasoning.  I know

9    you don't agree with it, Mr. Pladson.  Is there anything

10   else that needs explanation with respect to the motion to

11   dismiss?

12             MR. PLADSON:  I don't think so.  I was going to

13   raise a more pragmatic question about current events.

14             THE COURT:  Okay.  So lets get to that in just a

15   second.

16             Any further explanation needed with respect to my

17   ruling on the motion to dismiss?

18             MR. REVNEW:  No, Your Honor.

19             THE COURT:  Okay.  I am not going to write an

20   order.  I'm buried in orders right now.  I'll capture the

21   fact of this in the minutes, but that's part of why I really

22   prepared my thoughts in advance, so that you all could have

23   a ruling right away.

24             Let's talk about next steps.  So why don't you go

25   ahead.  Come on up to the podium and tell me what your

1    concerns are.

2         MR. PLADSON:  One of my clients happens to be

3    running for Vice President of the United States.

4         THE COURT:  I've noticed.

5         MR. PLADSON:  So should a month and a half from

6    now, eight weeks, whatever it is, should that election

7    happen and he will take office in January, now I think --

8    you know, as you mentioned before, the facts on the ground

9    are very much shifting and changing and he, if that happens,

10   would not be the governor any longer.  We would have a

11   different governor, and my understanding would be that the

12   threats no longer apply because they're not articulated by

13   the same person.

14         I just wanted to raise that as a point of what is

15   our -- in order to move forward --

16         THE COURT:  So you're saying could you renew the

17   motion to dismiss once you have a different governor who

18   might not be making speeches?

19         MR. PLADSON:  Yes, and I probably would.  But I

20   wanted to see pragmatically if -- were we to agree to a stay

21   just until November 6th or the day after or -- well,

22   hopefully we know, but just which way we're going.

23         THE COURT:  You should probably stop talking now.

24   No, I'm just kidding.

25         Okay.  Let me ask you a couple questions that

1    might help with that set of questions.

2              MR. PLADSON:  Sure.

3              THE COURT:  Do you believe that discovery is

4    required in this case?

5              MR. PLADSON:  I do.

6              THE COURT:  Okay.  Judge Wright is the magistrate

7    judge in this case, and it is my intention to send the

8    parties to Judge Wright to talk about what the next steps

9    are.  What discovery is needed, what schedule is

10   appropriate, and when and how to tee this up for ultimate

11   ruling.  I know that plaintiffs are eager for summary

12   judgment.  I'm going to allow Judge Wright to grapple with

13   those questions in the first instance.

14             I think as a practical matter, you know, November

15   6th is right around the corner, and so depending on where

16   Judge Wright goes with those considerations, we may be

17   worrying about a tempest in a teapot prematurely.

18             MR. PLADSON:  That's fine.  I just kind of wanted

19   to flag that.

20             The other piece, too, is that my understanding is

21   that my clients have an immediate right to appeal the

22   sovereign immunity denial.  I haven't talked to them yet.  I

23   will be following up.  But that may -- also just for

24   pragmatic reasons, and I will let them know if we end up

25   going that route because it's an immunity question and --

1          THE COURT:  Yeah, I kind of lost sight of that.

2     Okay.  Well, I hope I explained myself well enough for

3     appeal purposes.

4          MR. PLADSON:  We'll be getting a transcript.  I've

5     got to get a contract in place first because it's

6     government.  Anyway, so I wanted to flag that as well.

7          THE COURT:  Okay.  And can you give me just a

8     thumbnail sketch -- I'm trying to resist my old magistrate

9     judge inclinations and not wonder about the discovery -- but

10    what kind of discovery do you think is necessary?

11         MR. PLADSON:  I think we need to know what the

12    threat is, how do they understand the law, and why do they

13    think that there's chill here?  It's a retaliation statute.

14    If you don't fire somebody for attending, then you have no

15    issue.  And it doesn't prohibit speech.  We don't have to

16    get into the dispute or the merits but --

17         THE COURT:  But that's merits-related discovery.

18         MR. PLADSON:  Yes.

19         THE COURT:  Okay.

20         MR. PLADSON:  So I think there's that.  I think we

21    may look at retaining an expert or two.

22         THE COURT:  Great.  Thank you.

23         Mr. Revnew?

24         MR. REVNEW:  Thank you, Your Honor.  No surprise,

25    we do not want any delay here.  We do not believe discovery

1    is necessary.  Certainly if the defendants have an appeal

2    right, they have the appeal right.  They also, if they don't

3    appeal, they have the duty to answer the complaint, I

4    believe it's within 14 days at this point.  I just want to

5    make that clear for purposes of the record.

6         THE COURT:  Okay.  So you disagree that discovery

7    is necessary.  If they choose to exercise their right to

8    appeal, they do so.  You would presumably bring up your

9    thoughts about whether any discovery is needed at that

10   pretrial conference before Judge Wright?

11        MR. REVNEW:  Yes, Your Honor.  And I know you're

12   delegating it to the magistrate judge, but I would be remiss

13   if I didn't raise that we do not believe that discovery is

14   necessary.  We believe this is a pure legal issue, and we

15   believe the Court should decide that pure legal issue as

16   expeditiously as possible because we are talking about a

17   First Amendment issue.

18        THE COURT:  Great.  Thank you.

19        MR. REVNEW:  Thank you.

20        THE COURT:  All right.  So I will wait with bated

21   breath to see if there's going to be an appeal or not.

22        I'm going to connect with Judge Wright and let her

23   know this will be coming her way and that the plaintiffs are

24   looking for some speedy action.  And then at her discretion

25   in terms of this schedule -- and I'm sure she'll be

1    consulting with me about -- you know, my general practice,

2    is not to allow early summary judgment.  My general

3    practice, though, is to encourage people to expedite

4    discovery to facilitate early summary judgment where that's

5    appropriate, and I'll let her sort through those things with

6    counsel for both sides.

7           Thank you for an excellent argument, again, and

8    for answering all my questions, again.

9           In terms of your question about what happens if

10   your client changes, I think we cross that bridge when we

11   come to it.  So if you file a motion, we'll see what happens

12   with it, and who knows where the case will be at that point.

13          Thank you.

14          (Court adjourned at 3:02 p.m.)

15                          *      *      *

16

17

18          I, Paula K. Richter, certify that the foregoing is

19   a correct transcript from the record of proceedings in the

20   above-entitled matter.

21

22          Certified by:  *s/ Paula K. Richter*  _____

23                         Paula K. Richter, RMR-CRR-CRC

24

25